FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

## Jul 12, 2024

SEAN F. McAVOY, CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

JEREMY H..,[1]

                    Plaintiff,

        v.

MARTIN O'MALLEY, Commissioner of
Social Security,

                    Defendant.

No.    2:23-cv-00298-EFS

**ORDER AFFIRMING THE ALJ'S DENIAL OF BENEFITS**

        Due to degenerative disc disease of the cervical spine, migraines, vertigo, left side weakness and tingling, diabetes, high blood pressure, asthma, acid reflux, insomnia, poor liver function, left shoulder pain, depression, post-traumatic stress disorder (PTSD), and obesity, Plaintiff Jeremy H. claims that he is unable to work fulltime and applied for disability benefits and supplemental security income

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

benefits. He appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly analyzed the opinions of James Brooks, PhD, and Jessica Bringman, MHNP; and improperly assessed Plaintiff's credibility as to his mental impairments. As is explained below, Plaintiff has not established any consequential error.  The ALJ's denial of benefits is affirmed.

## I.    Background

In January 2021, Plaintiff filed an application for benefits under Title 2 and in April 2023 filed an application for benefits under Title 16, claiming disability beginning January 1, 2018,[2] based on the physical and mental impairments noted above.[3] Plaintiff's Title 2 claim was denied at the initial and reconsideration levels.[4]

After the agency denied Plaintiff benefits, ALJ Marie Palachuk held a telephone hearing in May 2023, at which Plaintiff appeared with his representative.[5]  Plaintiff, a medical expert, and a vocational expert testified.[6]

---

[2] The onset date was amended to December 17, 2020.

[3] AR 215-221, 232-241, 266.

[4] AR 114, 126.

[5] AR 42-72.

[6] *Id.*

After the hearing, the ALJ issued a decision denying benefits.[7] The ALJ found Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[8] As to medical opinions, the ALJ found:

- The opinions of medical expert James Brooks, PhD, to be persuasive.

- The opinions of Jessica Bringman, MHNP, to be not persuasive.

- The opinions of state agency evaluators W. Miller Logan, PhD and Alvin Smith, PhD, that Plaintiff had no medically determinable psychological impairment to be not persuasive.

- The opinions of state agency evaluator Bonnie Lammers, MD, to be somewhat persuasive.

- The opinions of state agency evaluator Colleen Ryan, MD, to be largely persuasive.[9]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff meets the insured status requirements through September 30, 2025, and had not engaged in substantial gainful activity since December 17, 2020, the amended alleged onset date.

---

[7] AR 7-41.  Per 20 C.F.R. §§ 404.1520(a)-(g); 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[8] AR 23-29.

[9] AR 29-31.

- Step two: Plaintiff had the following medically determinable severe impairments: lumbar degenerative disc disease/lumbago, diabetes mellitus, asthma, obesity, depressive disorder, and PTSD.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, and the ALJ specifically considered Listings 1.15, 1.16, 3.03, 11.02, 12.04, and 12.15.

- RFC:  Plaintiff had the RFC to perform light work with the following exceptions:

   [Plaintiff] can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; he can frequently perform overhead reaching; he must avoid concentrated exposure to extreme temperatures, vibration, respiratory irritants, and hazards; he is able to understand, remember, and carry out simple routine tasks; he needs to be in a predictable environment with seldom change; he can have no assembly-line pace or similarly fastpaced work; and he is limited to no more than occasional interaction with the public, coworkers, and supervisors.

- Step four: Plaintiff is unable to perform his past relevant work as a sales representative for farm and garden equipment and supplies and as cashier II.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a housekeeping cleaner

(DOT 323.687-014), marker (DOT 209.587-034), and laboratory-sample carrier (DOT 922.687.054).[10]

In a prior order, the Court determined that Plaintiff's petition to this Court was timely filed.[11]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[12] and such error impacted the nondisability determination.[13] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[14]

---

[10] AR 12-35.

[11] ECF No. 15.

[12] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[13] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[14] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### III.    Analysis

Plaintiff seeks relief from the denial of disability on two grounds. He argues the ALJ erred when evaluating the medical opinions and when evaluating Plaintiff's subjective complaints regarding his mental impairments.  As is explained below, the Court concludes that Plaintiff fails to establish the ALJ erred in her evaluation of the medical opinion evidence, the listings, or Plaintiff's symptom reports.

### A.    Medical Opinion: Plaintiff fails to establish consequential error.

Plaintiff argues the ALJ erred in her evaluation of the medical opinions.[15] Specifically, Plaintiff first argues that the ALJ erred in finding the opinions of medical advisor James Brooks, PhD, to be persuasive because he did not consider Plaintiff's symptoms in their entirety and focused on cognitive limitations. Plaintiff also argues that the ALJ erred in failing to articulate her reasoning as to the consistency factor when considering the opinions of MHNP Bringman and in

---

simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[15] An ALJ must consider and articulate how persuasive she found each medical opinion, including whether the medical opinion was consistent with and supported by the record. 20 C.F.R. §§ 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

failing to consider that MHNP Bringman diagnosed Plaintiff with Bipolar disorder.
Plaintiff argues further that because she did not find the opinions of MHNP
Bringman or the state agency evaluators to be persuasive and Dr. Brooks
considered only Plaintiff's cognitive symptoms, the ALJ improperly relied on her
own non-expert opinion.

    1.    Standard

        The ALJ was required to consider and evaluate the persuasiveness of the
medical opinions and prior administrative medical findings.[16] The factors for
evaluating the persuasiveness of medical opinions and prior administrative
medical findings include, but are not limited to, supportability, consistency,
relationship with the claimant, and specialization.[17] Supportability and consistency
are the most important factors,[18] and the ALJ must explain how she considered the
supportability and consistency factors when reviewing the medical opinions and
support her explanation with substantial evidence.[19] The ALJ may consider, but is

---

[16] 20 C.F.R. §§ 404.1520c(a), (b); 416.920c(a), (b).

[17] 20 C.F.R. §§ 404.1520c(c)(1)-(5); 416.920c(c)(1)–(5).

[18] *Id.* §§ 404.1520c(b)(2); 416.920c(b)(2).

[19] *Id.* §§ 404.1520c(b)(2); 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The
agency must articulate . . . how persuasive it finds all of the medical opinions from
each doctor or other source and explain how it considered the supportability and
consistency factors in reaching these findings.") (cleaned up).

not required to discuss the following additional factors: the source's relationship to Plaintiff such as length of the treatment, purpose of the treatment relation and whether the source examined Plaintiff, as well as whether the source had advanced training or experience to specialize in the area of medicine in which the opinion was being given.[20] When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[21]  An ALJ is not required to articulate how they considered evidence from nonmedical sources using the requirements in paragraphs (a) through (c).[22]

2.    Dr. Brooks' Testimony

On May 25, 2023, James Brooks, PhD, appeared by telephone and testified before ALJ Marie Palachuk as a medical expert.[23] Dr. Brooks testified that his resume accurately reflected his background and that he understood that he was to testify as an impartial expert.[24]

---

[20] *Id.*

[21] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court review is constrained to the reasons the ALJ gave).

[22] 20 C.F.R. §§ 404.1520c(d); 416.920c(d)

[23] AR 42-72.

[24] AR 45-46.

Dr. Brooks, testified that he had never examined Plaintiff but had read his medical records up to Exhibit 22F.[25] Dr. Brooks noted that Plaintiff primarily receives his mental health treatment at Tri-State Behavioral Health and commenced treatment in 2021, when he became depressed and had suicidal ideation after he lost his job and his sister died.[26] He noted that Plaintiff had a GED, spent time in prison, and had a history of depression and anxiety.[27] He noted that in November 2021, Plaintiff's mental status examination showed intact cognitive functioning, capability of focused attention, suicidal ideation, and a diagnosis of depression and PTSD.[28]  He noted that Plaintiff reported alcohol use, that his cognitive attention was not impaired, and that he was advised to seek counseling.[29]  A medical record by MHNP Bringman in March 2022 also notes that Plaintiff was capable of focused attention and that in December 2022 she noted that Plaintiff was alert and oriented and had appropriate mood and memory within

---

[25] AR 46-47.

[26] AR 47.

[27] *Id.*

[28] AR 47-48.

[29] AR 48.

normal limits.[30] He noted that in December 2022 in her last note in the exhibit, MHNP Bringman found again that Plaintiff's cognitive functioning was intact.[31]

Dr. Brooks cited to a letter from a counselor who Plaintiff saw twice and noted that the counselor declined to diagnose Plaintiff due to insufficient information.[32] He noted that in March 2023 MHNP Bringman found Plaintiff's cognitive functioning to be intact.[33] Dr. Brooks then cited to the mental residual functional capacity assessment form completed by MHNP Bringman.[34] He stated that she had opined as to "a lot of dysfunctional items" in the marked category of impairment including maintaining attention, concentration, completing a normal work day or work week, maintaining page, having the ability to make decisions, being able to accept criticism, maintaining appropriate behavior, maintaining neatness, and dealing with changes.[35] Dr. Brooks stated that normally such findings would indicate that Plaintiff met or equaled a listing but that the reviewed

---

[30] *Id.*

[31] *Id.*

[32] AR 48-49.

[33] AR 49.

[34] *Id.*

[35] *Id.*

treatment notes generally indicated intact mental functioning with ability to maintain attention and concentration.[36]

Dr. Brooks explained that he did not believe that the treatment notes supported MHNP Bringman's opinions.[37] He stated that he gives greatest attention to mental status evaluations because they are objective evidence and throughout the treatment record, Plaintiff's mental status was noted to be intact with the ability to maintain attention and concentration.  He then opined that based on the objective evidence that he would place the "big criteria" at the moderate level.[38] He also opined that Plaintiff would be capable of unskilled work and could have at least occasional contact with supervisors, co-workers, and the general public.[39] Dr. Brooks also opined that the ALJ should limit Plaintiff to work that was not performed at an assembly line pace and had a predictable environment with not many changes in routine.[40]

When questioned by Plaintiff's attorney, Dr. Brooks stated that the term cognitive functioning relates to the ability to remember things, focus, concentrate,

---

[36] *Id.*

[37] AR 49-50.

[38] AR 50.

[39] *Id.*

[40] *Id.*

DISPOSITIVE ORDER - 11

and maintain attention.[41] He responded to the attorney's question whether there are other things in behavior that can cause problems other than cognitive issues that there are and he considered those things in assigning a moderate limitation.[42]

Dr. Brooks opined that it was possible that Plaintiff could have difficulty keeping a schedule and could miss one day of work per month.[43] Dr. Brooks stated when questioned that it was possible that Plaintiff's symptoms could flare from stressors at work and require him to leave and said that the record frequently noted irritability.[44] When asked if Plaintiff would be off task for fifteen percent of the day, Dr. Brooks testified that he did not believe so and noted that the mental status evaluations were mostly within normal limits.[45] When asked to consider other symptoms such as hopelessness and lack of energy, and their effect on Plaintiff's ability to maintain attendance, Dr. Brooks stated that he did not think that the record reflected extreme limitations.[46] Dr. Brooks stated that he gave the greatest weight to the overall cognitive functioning and that his limitations were

---

[41] AR 51.

[42] *Id.*

[43] AR 51-52.

[44] AR 52.

[45] *Id.*

[46] AR 52-53.

based on that.[47] When asked if he was giving weight to all the cognitive symptoms and not to other symptoms, Dr. Brooks stated that he did give weight to the other symptoms and accounted for them when assessing Plaintiff's limitations to be moderate.[48] When questioned what limitations Dr. Brooks assigned Plaintiff in the ability to adapt or manage oneself, he responded that he limited Plaintiff to simple tasks with limited pressures.[49] Dr. Brooks stated that it would be speculative to opine as to whether Plaintiff would have difficulty showing up for work.[50]

### 3. Relevant Medical Records

On November 1, 2021, Plaintiff presented to Jessica Bringman, MHNP to establish care.[51] He reported that he had been struggling with depression since his sister passed away in January and had suicidal thoughts and ideations in February and March.[52] Plaintiff reported he had lost his job in December 2020.[53] Plaintiff reported a troubled childhood with bullying, rape, and special education

---

[47] AR 53.

[48] *Id.*

[49] AR 54.

[50] *Id.*

[51] AR 1162.

[52] *Id.*

[53] *Id.*

due to a learning disability.[54] Plaintiff denied any inpatient hospitalizations but reported suicide attempts in February and March 2021 and self-harm behaviors.[55] On examination, appearance was grossly normal, affect was flat and sad, speech and movement were normal other than stuttering, attitude was cooperative, and thought process was normal with suicidal thought content and fair insight and judgment.[56] MHNP Bringman noted that Plaintiff was alert, awake and appropriate; had appropriate, cooperative, and tearful behavior; had mildly soft speech; had calm and sad affect and mood; was not cognitively impaired; was able to follow directions; was able to comprehend; had normal perception with no hallucinations or delusions; denied current suicidal ideation; was capable of focused attention; had intact executive function; and had fair insight and judgment.[57] MHNP Bringman opined that Plaintiff was a moderate suicide risk.[58] MHNP Bringman diagnosed Plaintiff with suicidal ideation, major depressive

---

[54] *Id.*

[55] AR 1165.

[56] AR 1168.

[57] AR 1169.

[58] *Id.*

disorder, and PTSD.[59] She advised that Plaintiff's wife take him to the emergency

room for evaluation of his suicidal thoughts and possible in-patient admission.[60]

On November 2, 2021, Plaintiff returned for follow-up and reported that he

had been evaluated the day prior at the emergency room and sent home.[61] He

reported vague suicidal ideation.[62] On examination, findings were consistent with

the day prior and he was deemed a moderate suicide risk.[63] Plaintiff reported that

his wife would keep his medication in a safe and dose them daily as a safety

precaution.[64] MHNP Bringman increased Plaintiff's dosage of duloxetine and

encouraged him to discontinue use of alcohol.[65]

On November 15, 2021, Plaintiff presented to MHNP Bringman and

reported that he was having off and on suicidal ideations and some continued

depression.[66] Plaintiff reported auditory hallucinations of something behind him

making noises and visual hallucinations of seeing people walking past him while

---

[59] AR 1170.

[60] *Id.*

[61] AR 1172.

[62] *Id.*

[63] AR 1177.

[64] AR 1178.

[65] AR 1178-1179.

[66] AR 1180.

watching television but denied paranoia or delusions.[67] Examination findings were unchanged with the exception of increased stuttering and Plaintiff remained at moderate risk for suicide.[68]

On November 30, 2021, Plaintiff presented to MHNP Bringman and reported that his wife was seeing improvement and that he believed that his moods were better.[69] Plaintiff reported that he had continued difficulty sleeping, had nightmares two times a week, and was having visual hallucinations daily.[70] MHNP Bringman noted that Plaintiff was alert, awake, and appropriate; had appropriate, cooperative and tearful behavior; had mildly soft speech; had calm and sad affect and mood; was not cognitively impaired; was able to follow directions; was able to comprehend; had normal perception with no hallucinations or delusions; denied current suicidal ideation; was capable of focused attention; had intact executive function; and had fair insight and judgment.[71] MHNP Bringman noted that Plaintiff continued to improve on medication and his suicidal ideations had subsided.[72]

---

[67] AR 1183.

[68] AR 1186.

[69] AR 1191.

[70] *Id*.

[71] AR 1197.

[72] AR 1198.

On December 28, 2021, Plaintiff presented to MHNP Bringman for follow-up.[73] He reported difficulty sleeping and complained of visual hallucinations of shadows mainly at night.[74] On evaluation, Plaintiff was alert and active; was appropriate and cooperative; had mildly soft speech with stuttering; had no psychomotor abnormalities; had a calm and relaxed mood and a calm, relaxed, sad affect; had intact cognition; was able to follow directions well; had intact comprehension; showed no delusions or hallucinations; had a logical thought process; was capable of focused attention; had intact executive functioning; and had fair insight and judgment.[75] Plaintiff asked that his buspirone be increased, and MHNP Bringman opined that it would be helpful to add clonidine but needed to speak with Plaintiff's primary doctors regarding his blood pressure.[76]

On January 11, 2022, Plaintiff presented to MHNP Bringman and reported that his depression and anxiety were improving.[77] Plaintiff reported continued sleep difficulty and denied homicidal or suicidal idea for a month but reported continued visual hallucinations of shadows in his peripheral vision.[78] Evaluation

---

[73] AR 1200.

[74] *Id.*

[75] AR 1205-1206.

[76] AR 1207.

[77] AR 1209.

[78] *Id.*

findings were unchanged from his prior visit.[79] Plaintiff was deemed a low suicide risk.[80] On January 31, 2022, Plaintiff presented for follow-up and reported that he was "doing okay" with less anxiety and no longer having daily nightmares, and no longer having suicidal or homicidal ideation but thought he still had some paranoia and hallucinations.[81] On mental status evaluation, all findings were within normal limits with the exception of stuttering, a calm and relaxed but flat affect and fair insight and judgment.[82] MHNP Bringman noted that mood and anxiety had improved but depression had not and opined that a new medication needed to be added to normalize sleep.[83] On February 28, 2022, Plaintiff presented for follow-up and reported that he was doing okay but not able to sleep much.[84] Plaintiff reported that his depression was improved and he was going out more often but that he had some anxiety when in public.[85] On examination, his mental status was normal, attitude was cooperative, mood was depressed, affect was flat, speech and movement was normal, thought process and thought content were normal, and

---

[79] AR 1214-1215.

[80] AR 1215.

[81] AR 1218.

[82] AR 1223-1224.

[83] AR 1225-1226.

[84] AR 1227.

[85] Id.

insight and judgment were fair.[86] Plaintiff reported improvement with mood and

anxiety and stated that he was no longer suicidal, and no longer engaging in self-

harming behaviors.[87] Plaintiff's memory was improved and was sleeping 4 to 5

hours a night.[88] MHNP Bringman increased Plaintiffs dosage of clonidine and

started tapering him off Seroquel.[89]

On March 29, 2022, Plaintiff presented for medication management.[90]

Plaintiff reported that he had been stable and is sleeping better but reported

auditory hallucinations of hearing voices.[91] Plaintiff's mental status examination

was not changed.[92] MHNP Bringman noted improvement in Plaintiff's sleep but no

further improvement in his depression and anxiety and stated that his

improvement was slow but continual.[93] On May 24, 2022, Plaintiff presented to

MHNP Bringman complaining of continued depression but stating that he was

---

[86] AR 1233.

[87] AR 1235.

[88] *Id.*

[89] *Id.*

[90] AR 1237.

[91] AR 1237.

[92] AR 1243.

[93] AR 1244-1245.

DISPOSITIVE ORDER - 19

getting out more often.[94] MHNP Bringman noted increased anxiety and depression as a result of family issues and opined that Plaintiff might benefit from a sleep study.[95] MHNP Bringman noted that Plaintiff was having trouble making appointments with his therapist and referred him to a different facility.[96]

On June 6, 2022, Plaintiff and his wife presented to MHNP Bringman and his wife reported that he had not been sleeping and had been yelling at family members.[97] Plaintiff reported that he had not started his daytime dosage of clonidine, as prescribed.[98] Plaintiff's mental status examination was unchanged.[99] MHNP Bringman noted that there was a possible differential diagnosis of a mood disorder and that Plaintiff had experienced a significant increase in irritability and agitation since his last appointment with difficulty sleeping.[100] She opined that his auditory hallucinations were likely a reaction to trauma and noted that he was not psychotic that day and she had never observed him to be psychotic.[101] She

---

[94] AR 1246.

[95] AR 1253.

[96] AR 1254.

[97] AR 1255.

[98] *Id.*

[99] AR 1261.

[100] AR 1263.

[101] *Id.*

restarted Plaintiff on Seroquel.[102] At a follow-up on June 30, 2022, Plaintiff

reported that he was stable and sleeping better with Seroquel but that he and his

wife were taking a break.[103] He reported "small hallucinations" and denied

paranoia or suicidal ideations.[104] On examination, his mental status was normal,

attitude was cooperative, mood was calm and relaxed, affect was calm and relaxed,

eye contact was avoidant and downcast, speech and movement was normal,

thought process and thought content were normal, and insight and judgment were

fair.[105] MHNP Bringman noted that Plaintiff had improvement in his anxiety and

was more relaxed that he had been in the last several appointments.[106]

On December 22, 2022, Plaintiff presented to MHNP Bringman and reported

that he was doing well but that he had run out of one of his medications two weeks

prior and was finding that his mood decompensated and that he was irritable and

not sleeping well.[107] On examination, his mental status was normal, attitude was

cooperative, eye contact was maintained, mood was irritable, affect was calm and

incongruous with mood, speech and movement was normal, thought process and

---

[102] *Id.*

[103] AR 1265.

[104] *Id.*

[105] AR 1271.

[106] AR 1273.

[107] AR 1372.

thought content were normal, and insight and judgment were fair.[108] MHNP Bringman diagnosed bipolar II, depressive disorder, and PTSD and opined that she believed he met the diagnostic criteria for bipolar II.[109] On January 16, 2023, Plaintiff presented for follow-up and reported that his symptoms had resolved since restarting his medication, Caplyta, and he was now having no significant depression and sleeping well most nights.[110] On examination, his mental status was normal, attitude was cooperative, mood was calm and relaxed, affect was calm and relaxed, speech and movement was normal, thought process and thought content were normal, and insight and judgment were fair.[111] No medication changes were necessary.[112]

On March 13, 2023, at a follow-up appointment Plaintiff reported that with the exception of one week he felt depressed he was doing well and that he was having more nights of restful sleep than poor sleep.[113] .[114] On examination, his mental status was normal, attitude was cooperative, he maintained eye contact,

---

[108] AR 1378.

[109] AR 1380.

[110] AR 1381.

[111] AR 1387.

[112] AR 1389.

[113] AR 1391.

[114] AR 1381.

mood was calm and relaxed, affect was calm and relaxed, speech and movement was normal, thought process and thought content were normal, and insight and judgment were fair.[115] Plaintiff reported that he was doing well on his medications and experiencing no side effects.[116]

On May 17, 2023, MHNP Bringman completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).[117] She said that Plaintiff's ability to understand, remember, and carry out instructions was affected by his impairment[118] She opined that he would be able to complete the following tasks the majority of the time but would have difficulty completing it once or twice a month: remember locations and work-life procedures; understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; and be aware of normal hazards.[119] She opined that Plaintiff could perform the following tasks regularly but would not be able to once or twice a week: perform activities within a scheduled, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision, interact appropriately with the public; and set

---

[115] AR 1396.

[116] AR 1398.

[117] AR 1418-1421.

[118] AR 1418.

[119] AR 1419-1420.

realistic goals or plan independently of others.[120] MHNP Bringman opined that

Plaintiff could occasionally perform the following tasks: maintain attention and

concentration for extended periods; complete a normal workday; perform at a

consistent pace; get along with co-workers and peers; maintain socially appropriate

behavior; adhere to basic standards of neatness and cleanliness; respond

appropriately to changes in the work setting; and travel in unfamiliar places or use

public transportation.[121] She opined that Plaintiff would almost never be able to

perform the following tasks: work with or near others without being distracted by

them, make simple work-related decisions, and accept instruction or respond

appropriately to criticism from supervisors.[122] MHNP Bringman hand-wrote a

narrative explanation of her findings, which stated:

> [Plaintiff[ suffers from PTSD and bipolar II disorder. Many of his
> symptoms make it difficult for him to interact with his peers as well as
> his family for extended periods of time. He often needs breaks from
> social settings. While [Plaintiff] could work he likely could only work
> for very limited time periods before his PTSD symptoms would become
> problematic for him and his co-workers and supervisors."[123]

She went on to state further:

> Again, [Plaintiff's] diagnosis of PTSD is debilitating to him a majority
> of the time. He struggles to complete basis daily tasks including basic
> standards of neatness and cleanliness at times due to his mental health

---

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] AR 1419.

status. At other times he is appropriate with these tasks. When he is struggling with his symptoms in social settings co-workers and peers would not find his behaviors socially appropriate.[124]

MHNP Bringman also noted that Plaintiff managed his medications and that his wife or stepmother managed his finances.[125]

4.    Analysis

   a.    *The ALJ's consideration of the opinions of Dr. Brooks*

The ALJ gave the following reasoning as to her consideration of Dr. Brooks' testimony:

> As for medical opinion evidence or prior administrative medical findings, Dr. Brooks testified that the claimant is capable of performing "unskilled" work with occasional contact with coworkers, supervisors, and the public. He added that it would be appropriate to limit the claimant to jobs not involving assembly line work or a lot of changes in routine (Hearing Testimony). Dr. Brooks reviewed all of the submitted medical evidence, and he has a strong understanding of the Social Security Administration's disability programs and evidentiary requirements. The undersigned deems his medical opinion persuasive, while also concluding that the totality of the evidence is most consistent with the above-listed mental residual functional capacity. For example, Dr. Brooks cited multiple specific progress notes by exhibit and page number (including for exams conducted by nurse practitioner Bringman) featuring observations of intact cognitive function and capability for focused attention (Id.). That evidence supports his medical opinion. The balance of the evidence shows that while the claimant at times exhibited abnormal mood or affect, avoidant/downcast eye contact, and intermittently self-reported hallucinations (beginning in November of 2021, and inconsistently with prior longitudinal medical records), he otherwise generally presented with normal mood and affect, well-nourished, non-toxic, or healthy appearance, normal alertness and orientation, clear or normal speech,

---

[124] AR 1420

[125] AR 1421.

adequate or better grooming or hygiene, no apparent or acute distress, the capability for focused attention, no suicidal ideation, cooperative behavior, maintained eye contact, fair or good judgment and insight, no hallucinations or delusions, and normal memory and comprehension over his medical history (see, e.g., Ex. 1F/4, 50; Ex. 2F/3; Ex. 3F/33; Ex. 4F/4, 7, 11; Ex. 5F/2, 4; Ex. 6F/113, 125, 129, 146, 153; Ex. 7F/44; Ex. 8F/6; Ex. 9F/22; Ex. 11F/9, 14; Ex. 13F/5; Ex. 14F/8, 16, 36, 54, 64, 72, 110; Ex. 16F/5; Ex. 17F/6-7, 26; Ex. 19F/7, 24, 26; Ex. 20F/6-7). This evidence is generally consistent with Dr. Brooks' opinion, and is most consistent with the above-listed mental residual functional capacity.[126]

Plaintiff argues that the ALJ erred in relying upon Dr. Brooks' testimony because he focused on Plaintiff's lack of cognitive deficits and Plaintiff did not allege that he suffered from cognitive impairments. Plaintiff also argues that Dr. Brooks did not testify that he had conducted research or had an experience treating the mentally ill, but instead pointed to his experience in testifying at Social Security hearings.[127]

The Court notes that the record contains a resume at Exhibit 21F, which identifies that Dr. Brooks served as a clinical psychologist at Larue Carter Hospitals from 1978 to 1982; served as chief psychologist at St. Vincent Hospital from 1982 to 1986; and served as chief psychologist in a private practice in Indianapolis, Indiana from 1986 to 2016.[128] There is ample evidence in the record that Dr. Brooks has experience in treating mental illness.

---

[126] AR 29-30.

[127] *Id.*

[128] AR 1416.

1
2
3
4
5
6
7

With regard to Plaintiff's assertions that Dr. Brooks erred by focusing on the cognitive deficits, the Court concludes that this is not supported by the record.   In his brief, Plaintiff alleges that: "by [Dr. Brooks'] . . .  own admission, he was not giving an opinion about the whole range of symptoms and limitations experienced by [Plaintiff], not just the cognitive function."[129] He further argues that Dr. Brooks' opinion "was therefore incomplete and cannot be elevated above Nurse Bringman's more comprehensive opinion."[130]

8
9
10
11
12
13
14
15
16

While Dr. Brooks used the words cognitive functioning when testifying, it was not his testimony that he focused solely on "cognitive deficits" but rather it was his testimony that he focused on the results of "mental status examinations" which he found to be within normal limits.[131]  Moreover, Plaintiff's counsel at hearing questioned Dr. Brooks extensively at the hearing as to this very issue and Dr. Brooks explained that he gave greater weight to the results of mental status examination findings regarding cognitive functioning but that he considered all of Plaintiff's symptoms as a whole when arriving at his opinion that there were moderate limitation.[132]

17
18
19
20
21
22
23

---

[129] ECF No. 17 at 18.

[130] *Id.*

[131] AR 52-53.

[132] AR 53.

When questioned whether he included limitations in the ability to adapt and manage oneself, Dr. Brooks responded that he had included limitations limiting Plaintiff to simple work, with few changes and no assembly line pace.[133] Additionally, Dr. Brooks considered Plaintiff's need to have time alone in limiting Plaintiff to only occasional interaction with supervisors, co-workers, and the public.[134] When Dr. Brooks' testimony is considered as a whole and his statement regarding cognitive deficits is read in that context, it is clear that he did not focus solely on cognitive functioning, as Plaintiff asserts.  It was Dr. Brooks' testimony that he considered the whole range of symptoms, and not just cognitive deficits. Moreover, the limitations to which Dr. Brooks opined provide for Plaintiff's symptoms as a whole and do not simply provide for unskilled work but also provide for limitations in work environment and social functioning.

Because the Court concludes that Dr. Brooks did not fail to consider Plaintiff's mental illness and its symptoms as a whole, the ALJ did not err in relying upon his testimony and she did not submit her own opinions in place of a qualified expert as Plaintiff asserts.

The Court thus concludes that Plaintiff failed to establish consequential error in the ALJ's consideration of Dr. Brooks' testimony.

---

[133] AR 54.

[134] AR 50.

1

### b.    *The ALJ's consideration of MHNP Bringman's opinions*

2    The ALJ articulated her considering of MHNP Bringman's opinions as

3    follows:

4    In May of 2023, Ms. Bringman opined that the claimant can "almost
     never" make simple work-related decisions, work with or near others
5    without being distracted by them and accept instructions and respond
     appropriately to supervisors. She added that "most of the time," the
6    claimant is unable to perform in numerous additional work-related
     mental activities, including maintaining attention and concentration
7    for extended periods, completing a normal workday or workweek,
     performing at a consistent pace, getting along with coworkers and
8    peers, maintaining socially appropriate behavior, adhering to basic
     standards of neatness and cleanliness, and responding appropriately to
9    changes in the work setting (Ex. 22F). This assessment is not
     persuasive. Ms. Bringman has evaluated and treated the claimant over
10   multiple years, but her severely restrictive opinion is not supported by
     her own longitudinal progress notes which very consistently feature
11   reporting of unimpaired cognition and comprehension, cooperative
     attitude, normal thought process, fair insight and judgment, the
12   capability for focused attention, no deficits in executive function, and
     no psychomotor abnormalities (see, e.g., Ex. 14F/8, 24-25, 54- 55, 82,
13   110; Ex. 17F/7, 44; Ex. 19F/7, 16, 25). Further, Ms. Bringman's severely
     limiting opinion is otherwise inconsistent with the balance of the
14   medical and nonmedical evidence, which is instead most consistent
     with the above-listed mental residual functional capacity for the
15   reasons previously detailed in evaluating the opinion testimony of Dr.
     Brooks.[135]

16

17    Plaintiff argues that the ALJ erred in her finding that MHNP Bringman's

18   opinions were not persuasive.  He asserts that the ALJ erred in focusing on normal

19   findings not relevant to the limitations endorsed, by failing to take into account

20

21   _____

22   [135] AR

23

that symptoms will flare, and by using boilerplate language when considering the consistency factor.  The Court will consider each argument.

Initially, the Court concludes that Plaintiff errs in his assertion that the ALJ used "boilerplate language" in her reasoning regarding the consistency factor and failed to state the specific evidence which was not consistent.  Plaintiff correctly quotes the first half of the ALJ's statement that, "Further, Ms. Bringman's severely limiting opinion is otherwise inconsistent with the balance of the medical and nonmedical evidence,"[136] but fails to include the relevant and substantive portion of the sentence.   His proffer fails to include the latter portion of the sentence that states, "which is instead most consistent with the above-listed mental residual functional capacity for the reasons previously detailed in evaluating the opinion testimony of Dr. Brooks."[137]

The language in the ALJ's reasoning as to Dr. Brooks opinion states the following:

> The balance of the evidence shows that while the claimant at times exhibited abnormal mood or affect, avoidant/downcast eye contact, and intermittently self-reported hallucinations (beginning in November of 2021, and inconsistently with prior longitudinal medical records), he otherwise generally presented with normal mood and affect, well-nourished, non-toxic, or healthy appearance, normal alertness and orientation, clear or normal speech, adequate or better grooming or hygiene, no apparent or acute distress, the capability for focused attention, no suicidal ideation, cooperative behavior, maintained eye contact, fair or good judgment and insight, no hallucinations or

---

[136] AR 30.

[137] *Id.*

delusions, and normal memory and comprehension over his medical history (see, e.g., Ex. 1F/4, 50; Ex. 2F/3; Ex. 3F/33; Ex. 4F/4, 7, 11; Ex. 5F/2, 4; Ex. 6F/113, 125, 129, 146, 153; Ex. 7F/44; Ex. 8F/6; Ex. 9F/22; Ex. 11F/9, 14; Ex. 13F/5; Ex. 14F/8, 16, 36, 54, 64, 72, 110; Ex. 16F/5; Ex. 17F/6-7, 26; Ex. 19F/7, 24, 26; Ex. 20F/6-7).[138]

Additionally, the ALJ noted that Plaintiff's activities of daily living were consistent with Dr. Brooks' opinions and not MHNP Bringman's noting that he reported engaging in household chores; in spending time with others in-person, by phone and by text; denied that he had any difficulty managing his finances; indicated he cared for multiple pets; played video games daily; went shopping; and interacted with the ALJ at his hearing without difficulty despite the fact that she was a stranger and an authority figure.

When read in context, the ALJ gave a detailed statement as to findings in the medical record which she felt were consistent with Dr. Brooks' opinion and inconsistent with MHNP Bringman's opinions. She also cited to specific activities of daily living which were more consistent with the former. Viewed in that context, the Court does not find the ALJ's reasoning to be deficient.

Plaintiff's argument that the ALJ erred in considering only the effects of cognitive limitations is similarly flawed. As was noted above in the Court's analysis of Dr. Brooks' opinions, the record reflects that both Dr. Brooks and the ALJ considered Plaintiff's symptoms as a whole and did not simply consider cognitive deficits. The ALJ in her consideration of MHNP Bringman's opinions,

[138] AR 29-30.

explicitly states that she considered that Plaintiff had a cooperative attitude, a normal thought process, and no deficits in executive functioning.[139]  By reference, the ALJ articulated that inconsistent evidence showed normal mood and affect, well-nourished, non-toxic, or healthy appearance, normal alertness and orientation, clear or normal speech, adequate or better grooming or hygiene, no apparent or acute distress, the capability for focused attention, no suicidal ideation, cooperative behavior, maintained eye contact, fair or good judgment and insight.[140]

The Court notes additionally that MHNP Bringman's diagnosis of bipolar disorder is a diagnosis for which she has set forth no opinion as to limitations.  A diagnosis is not required to be considered in the same manner as an opinion.  A medical opinion is a statement from a medical source about what an individual can still do despite her impairments, and whether the individual has one or more impairment-related limitations and restrictions.[141]

Thus, the Court concludes that the ALJ did not err in her consideration of MHNP Bringman's opinions.

---

[139] AR 30.

[140] *Id.*

[141] 20 C.F.R. §§ 404.1513; 416.913.

5.    Summary

Because the ALJ committed no error in her consideration of the opinions of Dr. Brooks and MHNP Bringman, the Court finds that no consequential error occurred, and a remand is not warranted.

**B.    Symptom Reports: Plaintiff fails to establish consequential error**

Plaintiff argues the ALJ failed to properly assess his subjective complaints regarding mental impairments only.  He argues that the ALJ erred in finding that his subjective complaints were not consistent with mental status evaluation, and presentation with generally "normal mood and affect."[142] He asserts that the ALJ failed to consider that MHNP Bringman frequently adjusted medication and encouraged psychotherapy and erred in finding his daily activities of playing video games, texting and video chatting others, and performing chores.[143]

1.    Standard

When examining a claimant's symptoms, the ALJ utilizes a two-step inquiry. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."[144] Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony

---

[142] ECF No. 17, at 19-20.

[143] *Id.*

[144] *Molina*, 674 F.3d at 1112.

1   about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing

2   reasons' for the rejection."[145] General findings are insufficient; rather, the ALJ

3   must identify what symptom claims are being discounted and what evidence

4   undermines these claims.[146] "The clear and convincing standard is the most

5   demanding required in Social Security cases."[147] Therefore, if an ALJ does not

6   articulate specific, clear, and convincing reasons to reject a claimant's symptoms,

7   the corresponding limitations must be included in the RFC.[148]

8       2.    Plaintiff's Testimony

9       Plaintiff testified that in January 2020 he was prescribed Cymbalta for

10  depression and said that when he is depressed he will isolate himself from

11

_____

12  [145] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Lingenfelter*, 504

13  F.3d at 1036).

14  [146] *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), and *Thomas v.*

15  *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently

16  explain why he discounted claimant's symptom claims)).

17  [147] *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r*

18  *of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

19  [148] *Lingenfelter*, 504 F.3d at 1035 ("[T]he ALJ failed to provide clear and convincing

20  reasons for finding Lingenfelter's alleged pain and symptoms not credible, and

21  therefore was required to include these limitations in his assessment of

22  Lingenfelter's RFC.").

23

others.[149] He said that he was released from his job because his symptoms got worse throughout the year and he was having a hard time staying on track.[150] Plaintiff said that he did not cancel his counseling sessions and that he went to the first two but the third and fourth time there was sign on the door saying they were closed.[151] He said that shortly after that, he moved due to issues at home.[152] He said that after he moved he tried to get an appointment with a new counselor but the counseling centers had six-month wait lists.[153]

Plaintiff testified that his depression fluctuates and that he has triggers.[154] He said that when depressed he also does not want to do anything and that he thought he was depressed before January 2020 but never sought treatment until his suicide attempt.[155] He said that when he has a nightmare of when people raise their voice he will shut down.[156] Plaintiff said he lived with his stepmother and that when she has relatives visit he tries to stay outside to avoid anxiety and

---

[149] AR 55.

[150] *Id.*

[151] AR 56.

[152] *Id.*

[153] *Id.*

[154] AR 57.

[155] *Id.*

[156] *Id.*

because he becomes claustrophobic.[157] He said that he also has trouble with crowds when he shops and that he tries to go shopping in the morning when it is not busy.[158]

Plaintiff described that when he has anxiety his heart will race and he gets "fluttery" when he speaks.[159] His anxiety builds when he is around others and when he is in a confrontation with people.[160] When he gets anxious, his stepmother will tell him to go stay in a quiet room and it usually takes him about thirty minutes to calm down.[161] He said that he needs to do this at least once or twice every day.[162] Plaintiff also said that he has insomnia and nightmares, and that he never sleeps more than four hours a night.[163] Medication has reduced the nightmares to only "a couple here and there."[164] He said that because of his lack of

---

[157] AR 58.

[158] *Id.*

[159] AR 58-59.

[160] AR 59.

[161] *Id.*

[162] *Id.*

[163] AR 60.

[164] *Id.*

sleep he feels drained and it is harder for him to concentrate on things.[165]  He feels sluggish and will nap for one or two hours about twice a week.[166]

Plaintiff said that at North 40 he worked as a salesperson, and then worked in the yard for a couple years before his neck surgery.[167]  When he came back from surgery, he was a salesperson and cashier but he was reduced to only the sales job.[168] He has physical problems and cannot lift more than twenty pounds past his shoulder, his left arm goes numb, he has pain in his shoulder blade on the left, and since his surgery he will get dizzy when he tries to claim a ladder.[169] He said that because of neuropathy in his foot he cannot stand on a hard surface or asphalt for too long.[170] Plaintiff said he can stand for an hour or two and then can stand again after taking a rest for about thirty minutes, but that he would need to use a cane.[171]He holds the cane in his right hand and cannot use it in his left because of his left arm injuries.[172] The cane was prescribed by a doctor and he has to use it for

---

[165] *Id.*

[166] *Id.*

[167] AR 61.

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] AR 61-62.

[172] AR 62.

1    balance every time he walks more than 250 feet.[173] When he goes to the grocery

2    store, he brings the cane but uses the cart.[174]

3          Plaintiff said that he normally stays at home and that when home his chores

4    are the dishes, vacuuming, and cleaning the bathrooms.[175] He said that on a bad

5    day he is grumpy and avoids others and that on a good day he is social.[176] He said

6    that two to three days a week are bad days.[177]  His bad days come when he is

7    triggered by getting mad the day before and also at times just come out of the

8    blue.[178]

9          3.    The ALJ's Findings

10         The ALJ found Plaintiff's statements concerning the intensity, persistence,

11   and limiting effects of the symptoms of his medically determinable mental

12   impairments not entirely consistent with the medical evidence and other evidence

13   in the record.[179]  The ALJ recited the medical record in detail, both regarding

14

15   _____

16   [173] *Id.*

17   [174] AR 62-63.

18   [175] AR 63.

19   [176] 62-64.

20   [177] AR 64.

21   [178] *Id.*

22

23   [179] AR 23-29.

Plaintiff's physical and mental impairments.[180]  She noted that Plaintiff's mental

health symptoms waxed and waned in the period during which he received his care

from his primary physician, John Rudolph, DO.[181]  The ALJ articulated the

following:

> [W]hile the claimant has at times exhibited abnormal mood or affect, avoidant/downcast eye contact, and intermittently self-reported hallucinations (beginning in November of 2021, and inconsistently with prior longitudinal medical records), he has otherwise generally presented with normal mood and affect, wellnourished, non-toxic, or healthy appearance, normal alertness and orientation, clear or normal speech, adequate or better grooming or hygiene, no apparent or acute distress, the capability for focused attention, no suicidal ideation, cooperative behavior, maintained eye contact, fair or good judgment and insight, no hallucinations or delusions, and normal memory and comprehension over his medical history (see, e.g., Ex. 1F/4, 50; Ex. 2F/3; Ex. 3F/33; Ex. 4F/4, 7, 11; Ex. 5F/2, 4; Ex. 6F/113, 125, 129, 146, 153; Ex. 7F/44; Ex. 8F/6; Ex. 9F/22; Ex. 11F/9, 14; Ex. 13F/5; Ex. 14F/8, 16, 36, 54, 64, 72, 110; Ex. 16F/5; Ex. 17F/6-7, 26; Ex. 19F/7, 24, 26; Ex. 20F/6-7).[182]

The ALJ then went on to give specific examples that at emergency

department visits in June 2020 and October 2020, Plaintiff reported no mental

health symptoms, and that at an October 2020 visit with Dr. Rudolph Plaintiff

denied depression or behavioral changes and had a grossly normal mental status

---

[180] On appeal, Plaintiff raises issue only as to the ALJ's consideration of his mental impairment and alleges no deficiency as to the ALJ's consideration of his physical impairments.

[181] AR 23-24.

[182] AR 24.

examination.[183] The ALJ noted that in January 2021, Plaintiff reported increasingly becoming depressed after being fired from his job and finding out that his father had cancer, but noted that those were situational stressors in the context of his mental health symptoms.[184]  She articulated:

> In short, the claimant referenced situational stressors in the context of his mental symptoms. On exam, he presented with depressed mood and flat/withdrawn affect. However, the balance of Dr. Rudolph's evaluation was largely unremarkable. In particular, the claimant had normal thought process and speech, normal thought content, no hallucinations, delusions, or suicidality, cooperative attitude, healthy appearance, and fair insight and judgment. Further, his mental status was otherwise "grossly normal" (Ex. 6F/70-72). Over additional gastroenterology and primary care evaluations in March and August of 2021, the claimant continued to present with largely unremarkable mental status, with various observations of normal mood and affect, healthy appearance, good judgment, normal recent and remote memory, cooperative attitude, normal thought content and thought process, and no hallucinations or delusions (Ex. 4F/3; Ex. 8F/6).[185]

The ALJ noted that Plaintiff began treatment with MHNP Bringman in November 2021, but noted that he reported additional situational stressors including the death of his sister in January 2021.[186] The ALJ noted that Plaintiff reported a history of hallucinations but that his medical records reflect that in the past he had not reported hallucinations during examinations and had consistently

---

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] AR 25.

denied having them.[187] The ALJ then noted that while Plaintiff was tearful and with sad mood and affect, his mental status examination was otherwise normal and that when referred to the emergency department for reported suicidal ideation he was released.[188] The ALJ noted that in January 2022 Plaintiff reported still having paranoia but that this was also inconsistent with prior medical records in which Plaintiff never reported paranoia.[189]

Additionally, the ALJ considered MHNP Bringman's statement that Plaintiff's reports of hallucinations were "likely a reaction to trauma" and that she did not believe Plaintiff to be psychotic and had never observed him to be psychotic in his visits.[190] She noted that the Plaintiff routinely presented with good hygiene, cooperative behavior, intact attention and concentration, and fair insight and judgment; and that she had not observed paranoia or perceptual abnormalities.[191]

Lastly, the ALJ noted that Plaintiff's condition had improved with medication, noting:

> The claimant repeatedly reported that medication (including Caplyta) had improved his mental symptoms (see, e.g., Ex. 17F/1; Ex. 19F/10, 27). For example, in January of 2023, the claimant denied "any significant depression," and further informed Ms. Bringman that he as

[187] Id.

[188] Id.

[189] Id.

[190] AR 26.

[191] Id.

1
2
3

"feeling better now that he has restarted his Caplyta" (Ex. 19F/10). Thereafter in March of 2023, Ms. Bringman similarly reported that the claimant had restarted Caplyta and that "he reports that his mood has improved. He is feeling much better" (Ex. 19F/27).[192]

4.  Analysis

Plaintiff alleges that the ALJ pointed to mental status examinations in support of her findings, but that the PHQ-9 (Patient Health Questionaire-9), PHQ-A (Patient Health Questionnaire -A) and GAD-7 (Generalized Anxiety Disorder-7)[193] forms contained in MHNP Bringman's records contradict these findings.[194] But Plaintiff's argument is flawed because each of the scales which he references is based upon his own subjective complaints.  He essentially argues that his subjective complaints are credible because they are supported by his own subjective complaints.  The Court finds it reasonable that the ALJ, rather than place the greatest reliance on Plaintiff's own subjective complaints, considered the objective mental status examination findings.

4
5
6
7
8
9
10
11
12
13
14
15
16

———————————

17
18

[192] *Id*.

19
20

[193] The PHQ-9, PHQ-A and GAD-7 are self-reported scales provided by the American Psychological Association and are used to screen and diagnose the severity of depression and anxiety. American Psychological Association, www.apa.org/depression-gouidelines.

21
22

[194] ECF No. 17 at 19-20.

23

Plaintiff also alleges that the ALJ did not consider that Plaintiff's medication was adjusted and he was encouraged to attend psychotherapy.[195]  But this is incorrect.  The ALJ did consider that Plaintiff's medication was adjusted and considered that Plaintiff's symptoms waxed and waned but that ultimately his medication was successful and that by January 2023 Plaintiff denied any significant depression.[196]

A claimant's improvement with treatment is "an important indicator of the intensity and persistence of . . . symptoms."[197] Symptom improvement, however, must be weighed within the context of an "overall diagnostic picture," particularly for mental-disorder symptoms which often wax and wane.[198] If treatment relieves symptoms to an extent that allows the claimant to return to a level of function he

---

[195] *Id.*

[196] AR 26.

[197] 20 C.F.R. §§ 416.929(c)(3), 404.1529(c)(3). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

[198] *Holohan v. Massanari*, 246 F.3d1195, 1205 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods ... are not inconsistent with disability.").

had before he developed mental-disorder symptoms, such treatment can undermine a claim of disability.[199]

The ALJ also did not err in considering that Plaintiff's claims of paranoia and hallucinations were inconsistent with the longitudinal record in which he consistently denied hallucinations and did not report paranoia. An ALJ may discount a claimant's symptom reports if they are inconsistent with his prior statements.[200] Additionally, Plaintiff argues that the ALJ erred in considering that he played video games daily, interacted with others, did chores and cared for pets because there was no evidence that he played the games or engaged in activities for an extended period or that he did not take breaks.[201]

The ALJ may discount a claimant's reported disabling symptoms if he can spend a substantial part of the day engaged in pursuits inconsistent with the reported disabling symptoms.[202] But "disability claimants should not be penalized

---

[199] *See* 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1).

[200] 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (The ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid.").

[201] *Id.* at 20.

[202] *Molina*, 674 F.3d at 1113.

1   for attempting to lead normal lives in the face of their limitations."[203] "The Social

2   Security Act does not require that claimants be utterly incapacitated to be eligible

3   for benefits, and many home activities may not be easily transferable to a work

4   environment where it might be impossible to rest periodically or take

5   medication."[204] For these reasons, activities of daily living bear on a claimant's

6   symptom reports only if the level of activity is inconsistent with the individual's

7   claimed limitations.[205]

8        In this instance, the Court concludes that the ALJ properly considered that

9   Plaintiff's reported activities were not consistent with his allegations of extreme

10  limitation.  Here, for instance, Plaintiff challenges the ALJ's formulated RFC,

11  stating that he is not even capable of occasional contact with others but reported

12  that he engages with friends daily and that he goes shopping two to three times a

13  week.

14

15

16  [203] *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (cleaned up)).

17  [204] *Smolen*, 80 F.3d at 1287 n.7.

18  [205] *Reddick*, 157 F.3d at 722. *See also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th

19  Cir. 2001) (The Ninth Circuit has "repeatedly asserted that the mere fact that a

20  plaintiff has carried on certain daily activities, such as grocery shopping, driving a

21  car, or limited walking for exercise, does not in any way detract from her credibility

22  as to her overall disability.").

23

Elsewhere in the decision, the ALJ addressed the inconsistency between Plaintiff's assertions that he is extremely limited in his ability to concentrate and focus.  The ALJ articulated:

> In his Function Reports, the claimant alleged that his abilities to concentrate and complete tasks are affected by his impairments. He also variously asserted that he can pay attention for periods of only 10 minutes or 15-20 minutes. Regardless, the claimant reported that he can pay bills, count change, and handle financial accounts. He acknowledged engaging in texting and video chat activity in communicating with others. The claimant also reported playing watching television/movies and playing video games on up to an everyday basis, while asserting that he takes breaks doing so (Ex. 7E; Ex. 13E). Clinically, the claimant has intermittently demonstrated avoidant/downcast eye contact. However, he has also repeatedly presented as "capable of focused attention" over a number of longitudinal evaluations (including during visits featuring avoidant eye contact), and has "maintained" eye contact at other exams (see, e.g., Ex. 14F/8, 16, 36, 54, 64, 110; Ex. 17F/7; Ex. 19F/7, 26). During the hearing, the claimant responded appropriately to numerous questions.[206]

Additionally, the ALJ pointed out that Plaintiff's reports of his activities of daily living have been inconsistent.  She noted:

> The claimant consistently indicated that he is able to pay bills, count change, and handle financial accounts, and denied any change in ability to handle money since the onset of his impairments. In his initial Function Report, the claimant also indicated that he cares for multiple dogs, including with regard to feeding, while adding that his wife and 15-year-old son help with animal care. In his subsequent Function Report, the claimant denied engaging in any pet/animal care (Ex. 7E; Ex. 13E). Clinically, the claimant has variously presented with adequate or better grooming, or as well-nourished, non-toxic, or well appearing, over numerous longitudinal evaluations (see, e.g., Ex. 1F/4, 50; Ex. 2F/3; Ex. 3F/33; Ex. 4F/7; Ex. 5F/2, 4; Ex. 6F/113, 125, 146, 153;

---

[206] AR 20.

1

Ex. 9F/22; Ex. 11F/9, 14; Ex. 13F/5; Ex. 14F/72; Ex. 17F/26; Ex. 19F/24).[207]

2

The Court concludes that based upon the record before it, the ALJ did not

3

err in her evaluation of Plaintiff's subjective complaints.   The Court finds that the

4

ALJ accurately recited the testimony and record and further concludes that the

5

ALJ adequately explained her reasoning.   The Court declines to remand as to this

6

issue.

7

     5.    <u>Summary</u>

8

It is the ALJ's responsibility to review and evaluate the conflicting evidence

9

and Plaintiff's subjective complaints.[208] The ALJ meaningfully explained why she

10

evaluated Plaintiff's subjective complaints as she did, and these reasons are

11

supported by substantial evidence.

12

**IV.   Conclusion**

13

Accordingly, **IT IS HEREBY ORDERED**:

14

     1.    The ALJ's nondisability decision is **AFFIRMED**.

15

     2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 17 and**

16

          **19**, enter **JUDGMENT** in favor of **Defendant**, and **CLOSE** the case.

17

IT IS SO ORDERED. The Clerk's Office is directed to file this order and

18

provide copies to all counsel.

19

20

21

---

[207] AR 21.

22

[208] *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999).

23

DISPOSITIVE ORDER - 47

1    DATED this 12th day of July 2024.

2

3               _Edward F. Shea_

                EDWARD F. SHEA

        Senior United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23